JOSEPH BAILEY, as Master of GRANT TRUE BLUE LOYAL ORANGE LODGE, No. 7, Respondent, *v.* GEORGE MONTGOMERY and JOHN MCALLISTER, Appellants.

First Department, May 18, 1917.

Insurance — Loyal Orange Institution of the United States of America — authority of supreme grand master to suspend subordinate lodge — right of suspended lodge to equitable relief — inadequate remedy under constitution and laws of order — injunction — evidence — validity of election of supreme grand master — notice of change of place of election — stipulation limiting issues — estoppel.

Provisions of the constitution and general laws adopted for the government of the Loyal Orange Institution of the United States of America examined, and *held*, insufficient to authorize the supreme grand master to suspend a subordinate lodge and to authorize others to assume its charter rights.

Suit by a subordinate lodge which has been so deprived of its rights to prevent those claiming under the authority of one, alleged to have been elected as supreme grand master, to organize, in the name of the plaintiff, another lodge. Evidence examined, and *held*, that a judgment in favor of the plaintiff should be affirmed;

That the one claiming to act as supreme grand master was not legally elected.

A contention by the defendant that it had been the custom in the order for the supreme grand master to exercise during the intervals between the sessions of the supreme grand lodge substantially all the powers conferred upon it, and among them the power to suspend or revoke the charters of subordinate lodges, is not available for the reason that the plaintiff was not shown to be in any way estopped by any prior invalid acts of a supreme grand master from ascertaining the invalidity of the acts affecting it.

A stipulation that the only issue to be determined was the legality of the election of the supreme grand master, because of its indefinite character, did not prevent the determination of the question as to the authority of the supreme grand master, especially since the defendants were not misled thereby.

The question of the authority of the supreme grand master under the constitution and general laws is one of law.

As the plaintiff did not have an adequate remedy under the constitution and general laws of the order, it was entitled to resort to a court of equity.

Where the original notice of a meeting of the grand lodge was signed by the supreme grand master and the supreme grand secretary, a notice of change in the place of meeting should be given under like authority and should be signed by the supreme grand master.

APPEAL by the defendants, George Montgomery and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 23d day of March, 1916, upon the decision of the court after a trial at the New York Special Term.

The judgment restrained the defendants, their agents, servants and followers from using the name of the plaintiff organization, and from continuing and attempting to reorganize the plaintiff organization, or forming a new association, or disbanding or disrupting the plaintiff organization, and from doing any other act, deed or thing contrary to the rights, remedies and benefits of the plaintiff association, or using the name of the plaintiff, or issuing circulars or letters in the name of the plaintiff. The judgment also dismissed the counterclaims of the defendants, by which they sought similar injunctive relief against the plaintiff.

*Oscar B. Thomas,* for the appellants.

*Milton Speiser,* for the respondent.

SMITH, J.:

This action has resulted from factional differences in the fraternal association known as the Loyal Orange Institution of the United States of America. That organization is made up of four classes of lodges, which in order of precedence are the supreme grand lodge of the United States, State grand lodges, district lodges and subordinate lodges. The subordinate lodges number upwards of 200. The supreme grand lodge is composed of a considerable number of elected officers and of representatives from each State grand, district and subordinate lodge, and its constitution and general laws are the law of the order.

Pursuant to a provision of the constitution, by virtue of which the power to issue charters for State grand, district and subordinate lodges is vested in it, the supreme grand lodge in 1880 granted a charter to the plaintiff organization as a subordinate lodge. The constitution provides for biennial meetings of the supreme grand lodge, at which its officers are to be elected, and at a biennial meeting held in Atlantic City in August, 1912, one Dunlap was elected supreme grand master, one Kirkland supreme grand secretary, one Lees supreme grand treasurer, and one McCaw supreme grand lecturer. Even at this time Dunlap and one McClintock, with whom Kirkland later associated himself, were at loggerheads, and thereafter each gathered together a faction of the order and a contest for supremacy ensued, which culminated in a complete schism at the biennial session of the supreme grand lodge which was held at Niagara Falls in August, 1914, pursuant to a resolution duly adopted at the preceding biennial meeting in Atlantic City, which resolution, however, did not specify the exact days or meeting place for the same; and accordingly in June, 1914, a notice was sent to all the lodges and officers of the Loyal Orange Institution throughout the United States announcing that the next session of the supreme grand lodge would be held "at Niagara Falls, N. Y., Tuesday, Wednesday and Thursday, August 24th, 25th and 26th, in the Assembly Hall of the Cataract Hotel." This notice was signed by Dunlap as supreme grand master and attested by Kirkland as supreme grand secretary.

In July, 1913, the state grand master of Pennsylvania, acting, as is stated, " with the approval, consent and authority " of Dunlap, as supreme grand master, had suspended a number of members of the order and had also revoked the charters of about twenty district and subordinate lodges in Pennsylvania, and at about the same time McCaw, the supreme grand lecturer, and Lees, the supreme grand treasurer, both members of subordinate lodges in Pennsylvania whose charters had been revoked, were also suspended by the state grand master of Pennsylvania. On the evening prior to the opening of the biennial session of the supreme grand lodge at Niagara Falls, Kirkland, in whose hands as supreme grand secretary were the credentials of the various delegates and members, refused to meet with the committee on credentials of which Dunlap was in control, or to turn over the credentials to them. Foreseeing a fight Dunlap, through one of his lieutenants, Lemmon, a past grand master of the supreme grand lodge, posted notices in the Cataract Hotel and one or two other hotels that the sessions of the supreme grand lodge would be held in Odd Fellows Hall. Pursuant to this notice the Dunlap faction, after having formally opened its meeting in one of the smaller parlors of the Cataract Hotel, adjourned to Odd Fellows Hall and there held the remainder of its sessions at one of which Dunlap was elected grand master. The Kirkland faction was composed of 129 representatives of State grand, district and subordinate lodges and of four of the elected officers of the supreme grand lodge, including Kirkland, Lees and McCaw and two past supreme grand masters. They proceeded to hold the opening session of their convention in the ballroom of the Cataract Hotel, which corresponds more closely than any other room to an " Assembly Hall " and which it appears was sometimes known by that name, and elected as supreme grand master one Taylor, to whom the plaintiff organization has since rendered allegiance.

It is apparent that since the events above outlined there have been in effect two organizations, each claiming to be the regularly constituted Loyal Orange Institution of the United States of America, and that the plaintiff organization which was represented in the Kirkland convention by Bailey, its present master, has, as stated, adhered to the organization

headed by Taylor.   Because of this latter fact, Dunlap, early in 1915 appointed a committee of seven to investigate charges against the plaintiff organization and notice of hearing thereon was given to Bailey, but plaintiff not recognizing the authority of Dunlap no defense to the charges was made and on February 22, 1915, Dunlap served notice on the plaintiff organization to the effect that upon the recommendation of the committee he suspended its charter for continued insubordination.   On March 10, 1915, the defendants and others who were members of the plaintiff lodge withdrew from one of its meetings announcing in substance that they intended to adhere to the Dunlap faction and to " start a new lodge under the name and number of the present lodge."   Defendant Montgomery was forthwith suspended, and after a hearing on notice to him, to which he did not respond, he was ordered suspended " until such time as he would return and apologize."   No charges were ever preferred against the defendant McAllister, but he was elected master of the new lodge, so called, and testified that he had withdrawn from the plaintiff lodge.   On April 7, 1915, Dunlap issued a dispensation to the defendant Montgomery to reorganize the plaintiff lodge, and the defendants thereupon sent out letters and held meetings for the purpose of accomplishing that result. This action was then commenced, and the plaintiff obtained an injunction *pendente lite* which has been made permanent by the judgment appealed from.

The trial court did not deem it necessary to determine which of the two factions is in fact the regularly constituted Loyal Orange Institution, but held that plaintiff was entitled to the relief given because the attempted suspension of its charter was ineffective and illegal.   In this he was clearly right, for appellants have not cited, nor have I been able to find in the constitution and general laws adopted for the government of the order, any provision which gives to the supreme grand master power to suspend a subordinate lodge and then to authorize others to assume its charter rights in the manner in which it has been sought to accomplish those results here.   The powers of the supreme grand master are enumerated in the constitution.   He is authorized to exercise the executive functions of the order, to exercise general supervision over the entire

order and the officers thereof, to inquire into the condition of the lodges and the affairs of any officers, under certain conditions to suspend *officers* and appoint successors "until an investigation of the facts may be had, by the proper committee or a special committee appointed for that purpose,". and to perform such other duties as may be required by the constitution and laws.' These provisions certainly furnish no direct authority for in effect depriving plaintiff forever of its charter and conferring it upon others, nor can authority to do so be reasonably implied therefrom. Such acts are plainly for the determination of the grand lodge, and not of the supreme grand master, as claimed by appellants. It is the contention of the appellants, and there is some evidence tending to show that it has been the custom in the order for the supreme grand master to exercise — during the intervals between the sessions of the supreme grand lodge which meets for a few days only every two years — substantially all the powers conferred on the supreme grand lodge by its constitution and general laws and among them the power to suspend or revoke the charters of subordinate lodges. But this fact does not avail appellants for the reason that plaintiff is not shown to be in any way estopped by any prior invalid acts of a supreme grand master from asserting the invalidity of what clearly appears to be an invalid act affecting it.

But it is claimed by appellants that this question is not in the case because the plaintiff stipulated that the only issue to be determined was the regularity of Dunlap's election. The stipulation relied on is of such an indefinite character that I think it should not be given the effect claimed for it, particularly in view of the fact that appellants cannot have been in any way misled thereby; the question of the authority of the supreme grand master under the constitution and general laws is one of law and not of fact, and is to be determined from the constitution and general laws which are in evidence.

Again, it is said that plaintiff has no standing in a court of equity because it has not shown that it has complied with the section of the general laws which provides that "no resort shall be had to any court of civil or criminal jurisdiction until the person or lodge aggrieved shall first have exhausted all the remedies given to him or it within the order." The constitu-

tion and general laws, it is true, do attempt in an indefinite and confused way to provide for relief by appeal, but so far as any general system is provided it is for appeal from subordinate lodge to district lodge, from district to State grand lodge and from State grand to supreme grand lodge. There is, however, a provision that " the Supreme Grand Lodge * * * shall have exclusive jurisdiction over all matters pertaining to the general welfare of the whole order, and appellate jurisdiction from the decisions of all State Grand, District or Subordinate Lodges, and its decisions shall be the final and supreme law of the Order. *It may hear and determine all matters in controversy, or grievances, brought before it by appeal or otherwise.*" I think it may be fairly said that under the sweeping language of the sentence last quoted the illegal action of Dunlap in suspending the plaintiff's charter and issuing a dispensation to others to reorganize and conduct the plaintiff lodge was a matter which might have been taken before the supreme grand lodge by appeal, and concededly this was not done. But it must be remembered that Dunlap's illegal action was taken in March and April of 1915, when the next stated session of the supreme grand lodge was more than a year distant, and that the laws of the order provide no method by which plaintiff could obtain a hearing before the supreme grand lodge or redress for the wrongs done it during this interval. It seems clear where, as here, the law of the order is so imperfect that the only remedy afforded plaintiff is totally inadequate to prevent irreparable injury being done it, that it would be manifest injustice to hold that this court is powerless to hear the plaintiff's grievances and grant such relief as the facts warrant.

Moreover, an appeal within the order seems to be impracticable, because the imperial grand orange council of the world, composed of delegates from all countries, cannot meet on account of the war. That is the next highest tribunal which could consider the regularity of the election at Niagara Falls. As far as this case depends upon the regularity of that election it would be futile to appeal either to the plaintiff's faction or to the Dunlap faction, because neither faction would be qualified to give an impartial judgment. It would seem, therefore,

that the plaintiff had not an adequate remedy within the organization, and may, therefore, bring this action.

Assuming, however, that the parties stipulated that the only question in the case was the regularity of Dunlap's election at Niagara Falls, we are still of the opinion that the plaintiff has rightfully prevailed in the court below. These questions the courts will avoid as far as possible, leaving the order itself to determine the regularity of its own elections. As before stated, however, inasmuch as the council of the world cannot meet on account of the war, it is necessary for us to adjudicate upon the regularity of Dunlap's election in 1914. Upon this question it will be remembered that a circular was sent around to all the lodges, which gave notice that a convention would meet in the assembly hall of the Cataract Hotel upon the twenty-fourth, twenty-fifth and twenty-sixth days of August. This circular was distributed in June. Provision was made for the care of the delegates at the Cataract Hotel and at the International Hotel adjoining. Upon the evening prior to the first day of the convention there appeared some notices around the Cataract Hotel to the effect that the sessions of the grand lodge would be held at the Odd Fellows' Hall, at Fourth and Niagara streets. This notice purported to be signed by the supreme committee on arrangements, by George T. Lemmon, who was a member of the Dunlap faction. But the original notice of the meeting was signed by Dunlap, the supreme grand master, and Kirkland, the supreme grand secretary. It would seem that if any change was to be made in the place of meeting, notice thereof should be given under like authority as was the original notice. At least it should have been signed by Dunlap, the supreme grand master, who was in sympathy with the attempted change, and a notice of change signed only by Lemmon assuming to act for a committee on arrangements would be wholly ineffective to change the place of the meeting. While there is some testimony in the record to the effect that the ballroom of the Cataract Hotel was also called the assembly hall, the preponderance of the evidence is that there was no room in the hotel which was generally known by that name. But the ballroom was large, seated a great many people, and was not infrequently used for conventions and lodge meetings,

and it is unquestionable that it answered more nearly than any other room in the hotel the description of "Assembly Hall," and there is not the slightest doubt that the Dunlap faction had full knowledge that the meeting of the Kirkland faction was to be held and was being held in this ballroom.

On the morning of the twenty-fourth of August the Kirkland faction met in this ballroom, held a morning session there, and adjourned for the rest of their sessions to Owl's Hall. The Dunlap faction did not appear in the ballroom, but they were apparently doubtful of the validity of the attempted change of the place of meeting from the Cataract Hotel to the Odd Fellows' Hall, so they met in one of the parlors of the Cataract Hotel, to which none were admitted but those to whom special white tickets had been issued by Lemmon, and from there adjourned to the Odd Fellows' Hall and held their convention, at which Dunlap was re-elected supreme grand master.

Upon the question of regularity, therefore, it would seem that the Kirkland faction had met pursuant to the original notice signed by the supreme grand master and supreme grand secretary in the place therein designated, while the Dunlap faction had gone to another place of which no authorized notice was given, and had held its convention. If the convention of the Kirkland faction were regularly held it would probably be immaterial as to which convention more nearly represented the lodge. We more readily reach the conclusion of their regularity, however, by reason of the fact that it is apparent that there were more lodges represented in the convention held by the Kirkland faction than in the convention held by the Dunlap faction, even after excluding the lodges in Pennsylvania which had been suspended. It is contended that the Kirkland faction was presided over by an officer who himself had been suspended. Even if this be the fact, it would seem to be more a matter of form than of substance, and if the convention in the assembly hall of the Cataract Hotel was the regular convention representing the greater number of lodges in the order, the fact that it was presided over by a person in fact suspended should not be deemed sufficient to invalidate its action. It is further contended that there were

more of the regular officers of the organization represented in the convention in Odd Fellows' Hall held by the Dunlap faction; but that would be natural, inasmuch as there was a contest to oust these very officers, all of whom would attend the convention at which they would be supported.

It becomes unnecessary, then, to review the question whether or not the Pennsylvania lodges were improperly suspended. This injunction is not sought to review that action. It is sought to prevent those claiming under the authority of Dunlap as supreme grand master to organize in the name of the plaintiff another lodge, which is, in effect, to take away the charter of the plaintiff lodge, which in our judgment is not authorized by the powers given to Dunlap in the constitution, nor was Dunlap legally elected at the convention at Niagara Falls with authority thereafter to act as supreme grand master.

The judgment should, therefore, be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, SCOTT and PAGE, JJ., concurred.

Judgment affirmed, with costs.